******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

THE ACCESS AGENCY, INC. *v.* SECOND CON-
SOLIDATED BLIMPIE CONNECTICUT
REALTY, INC. ET AL.
(AC 38178)

Lavine, Keller and Beach, Js.

*Argued January 5—officially released June 27, 2017*

(Appeal from Superior Court, judicial district of
Windham, A. Santos, J.)

*Lloyd L. Langhammer*, for the appellant (plaintiff).

*Richard S. Cody*, with whom, on the brief, was *Jon
B. Chase*, for the appellee (defendant Richard Taras-
cio, Jr.).

*Opinion*

BEACH, J. The plaintiff, The Access Agency, Inc., appeals from the judgment of the trial court rendered in favor of the defendant,[1] Richard Tarascio, Jr. The plaintiff claims the court erred in (1) finding that a guaranty signed in connection with an expired lease did not obligate the guarantor under a new lease and (2) using an exhibit for purposes beyond the limited purpose for which it was introduced. We affirm the judgment of the trial court.

Pursuant to a lease agreement executed in August, 2000, the plaintiff leased premises at 1325 Main Street in Willimantic (premises) to Second Consolidated Blimpie Connecticut Realty, Inc., (Consolidated Blimpie) for use as a sandwich shop (2000 lease agreement). The parties introduced into evidence several documents which together define the business relationships among the several entities. The seminal document is the lease agreement between the plaintiff landlord and Consolidated Blimpie, as tenant. The lease created a tenancy of five years, from August 1, 2000 until July 31, 2005. The lease granted to Consolidated Blimpie three options to renew the lease for three additional five year periods. The lease expressly incorporated a second document, entitled "Rider to Lease" (rider). The lease was executed in August, 2000, by representatives of the plaintiff and of Consolidated Blimpie.

The rider specifically contemplated the use of the premises as a Blimpie's franchise, and provided for the subletting of the premises to a franchisee of Blimpie International, Inc. The subtenant was required, according to the rider, to execute a personal guaranty. In the event that the "store" was transferred to another subtenant and the new subtenant signed a personal guaranty, the "prior subtenant shall be released from its guaranty." The rider also provided that Consolidated Blimpie was entitled to assign the lease, and paragraph 7 (b) provided that an assignment or sublease would not serve to extinguish the liability of the assignor or sublessor.

The rider specifically contemplated that Consolidated Blimpie did not have assets other than the lease, but was created for the purpose of negotiating and signing the lease. The rider provided that the plaintiff could not seek damages from any party other than the tenant "and/or, if appropriate, the sublessee." No stockholder or member of a limited liability company, expressly including Blimpie International, Inc., could be held liable for any obligation of the tenant. The rider further provided that Consolidated Blimpie would be subletting the premises to a Blimpie's franchisee, and, in the event of any default on the part of the sublessee, the plaintiff agreed to offer the tenant a new lease, so that Consolidated Blimpie could sublet the premises to

another Blimpie franchisee.

The structure of the arrangement can be gleaned from the rider and the lease. The tenant, Consolidated Blimpie, was acting in the interest of Blimpie International, the franchisor. Consolidated Blimpie effectively insulated itself from liability by having no assets other than the lease and by requiring the plaintiff to agree that no stockholders or members, including Blimpie International, Inc., could be held liable in damages. Consolidated Blimpie could freely sublet the premises to Blimpie franchisees, who were to pay rent directly to the plaintiff and were liable to the plaintiff in the event of default. In essence, the tenant, acting in the interest of the franchisor, decided who, as a Blimpie franchisee, would be in possession of the premises and who would serve to guarantee Consolidated Blimpie's obligations to the plaintiff.

The first relevant guaranty was executed by the defendant at approximately the same time as the first lease and rider were executed. The guaranty referenced the lease between the plaintiff and Consolidated Blimpie. The defendant generally guaranteed payment for liabilities incurred by Consolidated Blimpie under "the lease." The guaranty provided that the defendant's potential liability would "remain . . . payable even though the demised term or any renewal or extension thereof shall have expired," and an assignment of the lease or any subletting was not to release the defendant from liability as guarantor.

The first lease was renewed in 2005, for a five year period. In 2007, KRES-CT, LLC, (KRES-CT), became the successor, by merger, to Consolidated Blimpie. The renewed lease lapsed on July 31, 2010. A series of events took place at the end of 2010: the prior franchisee, Tri-Star Blimpie I, LLC, which was controlled by the defendant, sold its franchise, equipment and inventory to Marshall Gebhardt, who in turn entered into a new guaranty agreement with the plaintiff. The Gebhardt guaranty is identical in material respects to the guaranty previously executed by the defendant, except that it guarantees the obligations of "KRES-CT, LLC, successor by merger to [Consolidated Blimpie]." At approximately the same time, a "Renewal of Lease Agreement" was entered into by the plaintiff and KRES-CT. The renewal recited the prior merger of Consolidated Blimpie and KRES-CT, and generally incorporated the provisions of the prior leases. KRES-CT represented that it was the successor to all duties and obligations of the lessee.[2]

Finally, by letter dated January 6, 2011, the plaintiff was informed that Gebhardt had bought the franchise and that KRES-CT would remain liable as tenant.[3] As discussed previously, Gebhardt guaranteed KRES-CT's obligations.

On August 31, 2011, the plaintiff notified Gebhardt that it had not received rent payments for July and August, 2011. KRES-CT did not make rental payments after October 1, 2012. There was no claim that the defendant had not paid rent while he or his business entity was the franchisee, or that rents were in arrears when he sold his business to Gebhardt.

In 2014, the plaintiff commenced an action against the defendant and others for failure to pay rent under the terms of the lease agreement.[4] The court found that the 2010 agreement was a new lease agreement between the plaintiff and KRES-CT, in which KRES-CT agreed to be bound by the terms of the original lease agreement. The court found that the defendant's "obligations under the 2000 lease ceased when the plaintiff and KRES-CT signed the 'Renewal of the Lease.' Under the new lease, the plaintiff sought to protect itself in case of default by KRES-CT of its obligations, and thus required Gebhardt to guarantee the new lease obligations. . . . *Gebhardt was the sole guarantor of the new lease at the time that KRES-CT breached the lease and failed to pay rent.* The damages suffered by the plaintiff as a result of the breach are attributable to KRES-CT and Gebhardt as guarantor of the lease."[5] (Emphasis added.) The court rendered judgment in favor of the plaintiff as against KRES-CT and Gebhardt, and awarded the plaintiff damages in the amount of $57,368.18 against KRES-CT and Gebhardt, which included, inter alia, $43,940 in unpaid rent, as well as $8506 in attorney's fees, additional postjudgment attorney's fees in the amount of $1850, and $3072.18 in interest on the plaintiff's offer of compromise. The court found the defendant not liable and rendered judgment in his favor. This appeal followed.

I

The plaintiff first claims that the court erred in finding that Gebhardt was the sole guarantor of the 2010 lease agreement. We disagree.

"A guaranty is merely a species of contract. . . . [A] guarantee is a promise to answer for the debt, default or miscarriage of another. . . . The contract of guarantee is no doubt an agreement separate and distinct from the contract between the [lessor] and the [lessee]." (Citations omitted; internal quotation marks omitted.) *JSA Finanical Corp.* v. *Quality Kitchen Corp. of Delaware*, 113 Conn. App. 52, 57, 964 A.2d 584 (2009). "The interpretation of continuing guaranties, as of other contracts, is principally a question of the intention of the contracting parties, a question of fact to be determined by the trier of facts. . . . Even a continuing guaranty that is, in terms, unlimited as to duration, imposes liability upon a guarantor only for such a period of time as is reasonable in light of all of the circumstances of the particular case. . . . The finding of the trial court with

respect to the intent of the contracting parties regarding the scope of their contractual commitment is, like any other finding of fact, subject only to limited review on appeal. . . . Our role is limited to determining whether the decision of the trier of facts was clearly erroneous in light of the evidence and the pleadings in the whole record." (Citations omitted; internal quotation marks omitted.) *Monroe Ready Mix Concrete, Inc.* v. *Westcor Development Corp.*, 183 Conn. 348, 351–52, 439 A.2d 362 (1981). "In determining the parties' intentions, the trial court was entitled to rely on, inter alia, the language of the guaranty." *Connecticut National Bank* v. *Foley*, 18 Conn. App. 667, 670, 560 A.2d 475 (1989).

The plaintiff argues that the provisions of the 2000 lease agreement remained in effect, such that the defendant remained a guarantor, along with Gebhardt, of KRES-CT's obligations under the 2010 agreement. It contends that the following language of the guaranty signed by the defendant is clear regarding the continuing nature of the guaranty: "This Guaranty shall be an absolute and unconditional guaranty and shall remain in full force and effect as to the [defendant] during the demised term of said Lease, and any renewal or extension thereof, and thereafter so long as any Liabilities remain and payable even though the demised term or any renewal or extension thereof shall have expired." The plaintiff further argues that the "renewal agreement" did not create a new lease but rather extended the original lease agreement. In support of its argument, the plaintiff refers to the heading "Renewal of Lease Agreement" placed on the renewal agreement and to the clauses in the renewal agreement that recite that "KRES-CT assumed all duties and obligations of the lessee" and that "KRES-CT wishes to exercise its option to renew the Lease on the terms and conditions as contained therein . . . ." We disagree and conclude that the court's findings were not clearly erroneous.

The 2000 lease agreement provided that the term of the lease commenced on August 1, 2000, and ended on July 31, 2005. The lease agreement provided for three options to renew for a period of five years per renewal. In 2005, Consolidated Blimpie exercised its first option to renew. It is undisputed that the defendant guaranteed the 2000 lease agreement and that his guaranty also applied to the 2005 renewal. Further, the 2007 merger of Consolidated Blimpie into KRES-CT is not claimed to have affected the guaranty, because of the language of the documents discussed previously.

The court found factually, however, that neither Consolidated Blimpie nor KRES-CT, the successor to Consolidated Blimpie, renewed the 2000 lease in 2010; rather, the 2000 lease expired.[6] The 2010 agreement, signed by the plaintiff, stated that the 2000 lease agreement "as previously renewed, expired as of July 31, 2010."[7] *After the lease expired, the defendant's lim-*

*ited liability company sold the Blimpie's franchise to Gebhardt.* Peter Debiasi, the president of the plaintiff, testified that in 2010 Gebhardt bought the franchise, and, as such, the plaintiff began dealing with Gebhardt regarding the franchise. KRES-CT entered into the 2010 lease agreement with the plaintiff on December 20, 2010. Gebhardt signed a guaranty for obligations arising under the 2010 agreement.

The guaranty signed by the defendant provided that, under the lease from the plaintiff to Consolidated Blimpie, the defendant would "absolutely and unconditionally guarantee to [the plaintiff], its successors and assigns the full and prompt payment when due of all rents, charges and additional sums coming due under the Lease, together with the performance of all covenants and agreements of [Consolidated Blimpie] therein contained and together with the full and prompt payment of all damages that may arise or be incurred by [the plaintiff] in consequence of [Consolidated Blimpie's] failure to perform such covenants and agreements . . . ." There is no language in the defendant's guaranty that makes him liable for the obligations of a new tenant after the expiration of the 2000 lease agreement.[8]

The court's finding that the defendant did not guarantee obligations under the 2010 lease is reinforced by the reality of the business transaction, as outlined in the documents discussed at some length in the factual history section of this opinion. The documents executed by the parties in 2000 contemplated that the tenant, in effect the franchisor, had the ability freely to sublease the premises to serial franchisees. The rider, signed by the plaintiff, plainly stated that a sublessee was to be released from his obligation as guarantor when a successor sublessee was substituted on the premises.[9] In sum, the court's findings that the 2000 lease agreement had expired and that Gebhardt was the sole guarantor of the 2010 agreement are supported by the record and, as such, are not clearly erroneous.

II

The plaintiff next claims that the court committed reversible error when it used an exhibit for substantive purposes rather than only for the limited purpose for which it had been admitted. We conclude that there was error, but that it was harmless.

At trial, the court permitted the defendant to introduce a letter dated January 6, 2011, for the limited purpose of impeaching Debiasi. The letter notified the plaintiff that there would be a new Blimpie's franchise on the premises. In reaching its conclusion that Gehardt was the sole guarantor of the 2010 agreement, the court noted that "[t]he January 6, 2011 letter to the plaintiff reminds the plaintiff that Gebhardt is the new franchisee and that KRES-CT is the new tenant."

"Evidence which is offered and admitted for a limited

purpose only, and the facts found from such evidence, cannot be used for another and totally different purpose." *O'Hara* v. *Hartford Oil Heating Co.*, 106 Conn. 468, 473, 138 A. 438 (1927). It was improper for the court to use the letter for substantive purposes when it was admitted for the limited purpose of testing Debiasi's credibility. Such error, however, is subject to a harmless error analysis. See *Testone* v. *C. R. Gibson Co.*, 114 Conn. App. 210, 218–19, 969 A.2d 179, cert. denied, 292 Conn. 914, 973 A.2d 663 (2009). Other evidence that Gebhardt was operating a Blimpie's franchise on the premises was before the court. The 2010 agreement stated that the 2000 lease had expired, and the bill of sale indicated that the defendant sold the Blimpie's franchise to Gebhardt. The letter was cumulative of other evidence, including uncontested documents, and was most unlikely to have affected the result. See *Federal Deposit Ins. Corp.* v. *Carabetta*, 55 Conn. App. 384, 389, 739 A.2d 311 (whether improperly admitted evidence was cumulative is factor in harmless error analysis), cert. denied, 251 Conn. 928, 742 A.2d 362 (1999).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The complaint was also brought against Second Consolidated Blimpie Connecticut Realty, Inc., KRES-CT, LLC, and Marshall Gebhardt. The court clerk granted the plaintiff's Practice Book § 17-20 motion for default for failure to appear as to those parties. Tarascio only filed a brief in response to the plaintiff's appeal. We will refer to Tarascio only as the defendant.

[2] Exhibit 3 is an unsigned copy of the "Renewal of Lease Agreement"; it contains a signature line for a representative of KRES-CT. The parties appear to have deemed Exhibit 3 to be authentic.

[3] The plaintiff claims that this letter was improperly used for substantive purposes by the court. See part II of this opinion.

[4] See footnote 1 of this opinion.

[5] The defendant filed a "cross complaint" on which the court found in favor of the plaintiff and Gebhardt. The judgment on the "cross complaint" is not an issue on appeal.

[6] Although the title of the 2010 agreement is "Renewal of Lease Agreement," it does not necessarily follow that the 2010 agreement was in fact a renewal of the 2000 lease. There is ample evidence in the record to support the court's conclusion that the 2010 agreement was a new lease rather than a renewal.

[7] Additionally, the rider to the 2000 lease provides in relevant part that "[w]ithin sixty (60) days prior to the expiration of the time within which [Consolidated Blimpie] is required to give notice of the exercise of and option to extend the term of this Lease, [the plaintiff] shall give written notice to [Consolidated Blimpie] advising [Consolidated Blimpie] of the time within which its right to serve the notice expires." There was no evidence presented that the plaintiff sent such notice.

[8] Subsection 7 (d) of the rider to the 2000 lease provides that "[t]he subtenant shall execute a personal guaranty in the form attached hereto. Upon transfer of the store to another subtenant, provided the new subtenant executes a personal guaranty, in the same form attached hereto, the prior subtenant shall be released from its guaranty." The plaintiff argues that the defendant did not allege release as a special defense. In his special defenses, however, the defendant claimed that "Gebhardt is the sole guarantor of the Lease alleged to have been breached."

[9] We note that, under the scheme, the prior sublessee would nonetheless be responsible for obligations incurred while he was sublessee. It makes economic sense for a franchisee to be liable for his own debts, as the franchisee paid rent directly to the landlord, but not for those of a successor who might come to occupy the same premises.